IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAZEER AMODU | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  25-583 |
| | : | |
| OXFORD REHABILITATION AND | : | |
| HEALTHCARE CENTER | : | |

MEMORANDUM

**MURPHY, J.**                                                                                          **June 5, 2026**

This is a Title VII employment discrimination case.  For approximately one year, Nazeer

Amodu worked at Oxford Rehabilitation and Healthcare Center (Oxford) as a Nursing

Supervisor.  In this role, he supervised other nurses, most of whom were white women.  Mr.

Amodu is an African man from Nigeria.  During his employment, two of Mr. Amodu's

supervisees lodged sexual harassment complaints against Mr. Amodu.  Oxford investigated Mr.

Amodu regarding the harassment claims, suspended him while doing so, and ultimately

terminated him because of the harassment.  Mr. Amodu denies the harassment allegations, rejects

Oxford's basis for terminating him, and claims that he was instead terminated for discriminatory

reasons: his race, national origin, and sex.  Following discovery, Oxford now moves for

summary judgment.  We grant the motion because Mr. Amodu did not adduce evidence that a

reasonable jury could rely on to rebut Oxford's legitimate, non-discriminatory reason for

terminating him.

## I.      FACTUAL BACKGROUND

In May of 2023, Mr. Amodu was hired for a Nursing Supervisor position with Oxford.

DI 23 at ¶ 1.  Mr. Amodu identifies as a dark-skinned man from Nigeria.  *Id.* at ¶ 2.  Upon

beginning his employment, Mr. Amodu received and reviewed Oxford's employee handbook,

policies, and training related to Oxford's harassment and sexual harassment policies. *Id.* at ¶¶ 3-10. The handbook provides examples of prohibited sexual harassment, including "unwelcome flirtations, leering, touching, and sexually related comments." *Id.* at ¶ 15. Oxford's policies state that every harassment complaint will be investigated, and it was commonplace for Oxford to conduct investigations into employee misconduct, such as sexual harassment allegations. *Id.* at ¶¶ 16-17. Oxford lists violations of its harassment and discrimination policies as "Group IV" violations (where Group IV is the highest level), and its policies state that a violation of harassment policies may result in the termination of employment. *Id.* at ¶¶ 18-19.

In May 2024, Mr. Amodu received a write-up for unsatisfactory job performance. *Id.* at ¶ 26. At some unknown time, Mr. Amodu alleges that an unidentified individual made discriminatory remarks about Mr. Amodu's sex. *Id.* at ¶ 27. He also alleges that, at some unknown time, unidentified female employees made discriminatory remarks regarding his race and national origin. *Id.* at ¶ 28. Mr. Amodu asserts that, at some point during his employment, unidentified female individuals stated that African men are too strict and mean to women, that they do not like or respect women, and that they are too controlling. *Id.* at ¶ 29. He claims that he was treated differently at Oxford due to his national origin because he is foreign and black while most of his colleagues are white Americans. *Id.* at ¶ 30. Mr. Amodu alleges that he told his supervisor, Dawn Ranochak, that he was being treated differently than an unidentified white male unit manager. *Id.* at ¶ 31. He also claims that he told Ms. Ranochak and Kelly Grimaldi, Oxford's Administrator, that unidentified female employees would be complaining about him being too strict and too black-and-white. *Id.* at ¶ 32. Mr. Amodu asserts that he told Ms. Ranochak that his female subordinates were upset that he told them to put their phones away,

and in response, Ms. Ranochak told those employees that they had to follow Mr. Amodu's instructions. *Id.* at ¶¶ 36-37. Mr. Amodu never made a formal complaint about being treated differently due to his sex, race, color, or national origin, despite Oxford's policies stating that its employees should report such complaints to its Human Resources Department. *Id.* at ¶¶ 33-35.

During his employment, Mr. Amodu was informed that he was being accused of sexual harassment. *Id.* at ¶ 38. Oxford has a zero-tolerance policy for sexual harassment claims. *Id.* at ¶ 59. Mr. Amodu alleges that Human Resources employees conducted an investigation into the claims, during which time Mr. Amodu was suspended (which was common at Oxford). *Id.* at ¶¶ 39, 45-46. Two of Mr. Amodu's female subordinates made sexual harassment complaints against Mr. Amodu, which included claims involving unwanted sexual comments, kissing, touching, and leering by Mr. Amodu. *Id.* at ¶ 41; DI 23-1 at 107, 109. These individuals also reported Mr. Amodu's conduct to other employees at Oxford. DI 23 at ¶¶ 42-43; DI 23-1 at 111, 113. Mr. Amodu was not informed of the identity of his accusers, though he acknowledges that Oxford's policy was to maintain confidentiality during investigations. *Id.* at ¶ 55. He was asked whether he kissed or touched anyone (including on the neck or butt), or made inappropriate comments toward anyone, in the workplace. DI 23 at ¶¶ 45, 47. Mr. Amodu denied engaging in any inappropriate kissing, touching, comments, or other forms of sexual harassment, and he insists he was falsely accused of sexual harassment. *Id.* at ¶¶ 47-49; DI 23-1 at 115.[1] In July 2024, following what Oxford asserts was the conclusion of its investigation into the sexual harassment allegations against Mr. Amodu, Oxford fired Mr. Amodu purportedly due to the

---

[1] At no time did Mr. Amodu make any discrimination complaints against the two female individuals who conducted the investigation into the sexual harassment allegations. *Id.* at ¶ 61.

allegations. *Id.* at ¶¶ 56-57.[2]

## II.    MOTION AT ISSUE

Oxford seeks summary judgment, asserting that there is no evidence to support Mr. Amodu's Title VII claims of race, national origin, and sex-based discrimination. DI 24-1 at 6. It argues that Mr. Amodu fails to establish a *prima facie* case of discrimination because he has not shown that the circumstances of the adverse actions against him give rise to a discriminatory inference. *Id.* at 9-14. Oxford notes that Mr. Amodu does not allege that his direct supervisor, nor anyone involved in the decision to investigate or terminate him, made any discriminatory comments or displayed any discriminatory animus toward him. *Id.* at 11. It emphasizes that Mr. Amodu's discrimination allegations amount to "general, non-specific evidence [that] is not sufficient to defeat" summary judgment, emphasizing his failure to point to specific comparators or provide evidence beyond his mere subjective beliefs. *Id.* at 12-14; DI 26 at 4-5. To the extent Mr. Amodu argues a cat's paw theory of liability — under which an employer may be liable for discrimination if the source of such animus was an employee whose animus proximately caused the relevant adverse employment action by the decision-maker — Oxford contends that there is no evidence that (1) any unidentified, white female subordinates who allegedly complained about him had any role in the investigation or decision to terminate Mr. Amodu; or (2) the decision-makers displayed any discriminatory animus toward him. DI 26 at 7-10.

Even if Mr. Amodu can establish a *prima facie* case of discrimination, Oxford advances a legitimate, non-discriminatory reason (LNDR) for its actions regarding Mr. Amodu: the sexual

---

[2] While Mr. Amodu was employed at Oxford, there is no evidence that any other supervisory employees (1) were accused of sexual harassment; or (2) complained that their subordinates made inappropriate comments about them. *Id.* at ¶¶ 50-51.

4

harassment allegations against Mr. Amodu.  DI 24-1 at 14-16.  Oxford emphasizes its zero-tolerance policies for sexual harassment, of which Mr. Amodu was aware, and that it terminated Mr. Amodu after investigating the allegations — which involved interviewing and obtaining written statements from the two complainants and other employees who worked the same shift as them and Mr. Amodu, as well as interviewing Mr. Amodu.  *Id.* at 15-16.  Oxford also underscores Mr. Amodu's acknowledgment that it followed its clearly established policies respecting the sexual harassment claims.  *Id.* at 16.  And Oxford argues that Mr. Amodu cannot rebut this LNDR, as he cannot demonstrate that this constituted mere pretext for discrimination.  *Id.* at 16-19.  Mr. Amodu's only evidence, Oxford asserts, "is his own unsubstantiated opinion" that he was investigated, suspended, and terminated for discriminatory reasons, which is not enough to defeat its LNDR.  *Id.* at 19.

Mr. Amodu opposes summary judgment.  DI 25-1.  He argues that he has established a *prima facie* case of discrimination or, at a minimum, demonstrated that genuine questions of fact remain such that summary judgment is not warranted.  *Id.* at 4-10.  Focusing on the fourth prong of the *prima facie* standard (as the only contested standard at this stage), Mr. Amodu argues that the following facts give rise to a discriminatory inference: (1) most of his colleagues were white Americans; (2) most of his subordinates were white, non-Nigerian women; (3) he told Ms. Ranochak that his female subordinates were upset with him and having a hard time taking direction from him; (4) shortly before the sexual harassment allegations arose, he told Ms. Ranochak that his white female subordinates were going to complain about him being too strict and black-and-white; (5) he had heard female employees state that African men are too strict, controlling, and mean to women and that they do not like or respect women; (6) once accused, he

was not given an opportunity to respond to specific allegations from specific people; (7) he denies the allegations and asserts he was falsely accused of sexual harassment; and (8) Ms. Ranochak never saw him engage in such sexual harassment while at Oxford or their prior workplace, nor did she receive any such complaints about him at the prior workplace (nor any other complaints about him at Oxford, other than the instant sexual harassment complaints).  *Id.* at 8-10.  Mr. Amodu insists that, based on these facts, a factfinder reasonably could conclude that the sexual harassment allegations were not the real reason for his termination but that he instead was terminated for discriminatory reasons.  *Id.* at 9-10.

### III.    LEGAL STANDARDS

### A.    Summary judgment

We should grant summary judgment when the movant demonstrates "that there is no genuine dispute as to any material fact" such that they are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact."  *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021) (citation omitted).  When evaluating a summary judgment motion, we shall "view the record and draw inferences in a light most favorable to the non-moving party."  *In re IKON Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citation omitted).  And we must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To survive summary judgment, the non-movant's evidence need not be conclusive. *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 217 (3d Cir. 2002). "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary

judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citation modified) (citation omitted). However, "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320 (3d Cir. 2014) (citation omitted). In employment discrimination cases, we apply the summary judgment standard "with added rigor" because such cases often depend upon credibility and intent. *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (citation omitted).

**B.      Title VII claims**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual with respect to his terms, conditions, compensation, or employment privileges, or otherwise adversely affecting his status as an employee, because of his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In assessing whether an employer intentionally discriminated against its employee, we utilize the burden-shifting, circumstantial evidence test established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). This test has three parts: (1) the plaintiff must establish a *prima facie* case of discrimination; (2) if he succeeds in doing so, the burden of production shifts to the defendant-employer "to articulate some legitimate, nondiscriminatory reason" for its action against the plaintiff; and (3) if the defendant-employer succeeds in articulating such, the plaintiff must then prove, by a preponderance of the evidence, that the defendant-employer's proffered legitimate reason constituted mere pretext for discrimination. *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 1999), *abrogated on other grounds as recognized by Russo v. Bryn Mawr Tr. Co.*, 2024 WL 3738643, at *4 n.3 (3d Cir.

Aug. 9, 2024)[3] (*citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

To establish a *prima facie* case, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to retain or attain; (3) he suffered an adverse employment action; and (4) the circumstances in which that action occurred could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citations omitted). The plaintiff-employee's burden in proving a *prima facie* case is not heavy; a *prima facie* case "merely raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (*citing Furnco Construction Co. v. Waters*, 438 U.S. 567, 577 (1978)) (citation modified). An employee's subjective belief that race affected his employer's actions is insufficient to demonstrate an inference of discrimination, but we may infer discrimination from the employer's more favorable treatment of a similarly situated person who is outside of the employee's protected class. *Rodriguez v. AMTRAK*, 532 Fed. Appx. 152, 153 (3d Cir. 2013) (citing *Jones*, 198 F.3d at 410-11). "[W]hether a factor is relevant for purposes of a similarly situated analysis must be determined by the context of each case." *Houston v. Easton Area Sch. Dist.*, 355 Fed. Appx. 651, 654 (3d Cir. 2009). "In disciplinary cases or in the context of personnel actions, for example, the relevant factors often include a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged

---

[3] As explained by the *Russo* Court, *Muldrow v. City of St. Louis,* 601 U.S. 346 (2024), "arguably abrogated *Jones*" with respect to what may constitute adverse employment action. *Russo*, 2024 WL 3738643, at *4 n.3.

in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation modified). Generally, the question of whether individuals are similarly situated is a factual one reserved for the jury, but we may "grant summary judgment if no reasonable jury could find the individuals identified by the plaintiff[] were similarly situated." *Hampshire v. Bard*, 793 Fed. Appx. 75, 80 (3d Cir. 2019) (citation omitted); *Crawford v. Verizon Pa., Inc.*, 103 F. Supp. 3d 597, 605 (E.D. Pa. 2015) ("Determining who is a similarly-situated employee is a fact-intensive inquiry not readily susceptible to summary judgment.").

If the employee establishes a *prima facie* case of intentional discrimination, the burden of production shifts to his employer to proffer a legitimate, non-discriminatory reason (LNDR) for its action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer's burden is relatively light; it meets its burden by offering evidence which, construed as true, would enable the factfinder to conclude that the employer had a nondiscriminatory reason for its action. *Id.* (citation omitted). "The employer need not prove that the tendered reason actually motivated its behavior." *Id.* (citation omitted).

If the employer satisfies its burden in demonstrating an LNDR for its action against the employee, the burden shifts back to the employee. *Id.* To prevail, the employee must identify direct or circumstantial evidence from which the factfinder reasonably could either (1) disbelieve the proffered LNDR; or (2) believe that, more likely than not, an invidious, discriminatory reason was a determinative or motivating cause of the employer's action. *Id.* at 763-64 (citation omitted); *Steele v. Pelmor Labs. Inc.*, 642 Fed. Appx. 129, 134 (3d Cir. 2016) (citation omitted). Though the employee need not provide evidence that directly contradicts the proffered LNDR,

9

he cannot avoid summary judgment simply by arguing that his employer's LNDR need not be believed. *Fuentes*, 32 F.3d at 764 (citation omitted). To defeat summary judgment, the evidence must allow the factfinder to reasonably infer that each of the proffered LNDRs constituted pretext or a *post hoc* fabrication for the employer's action. *Id.* (citation omitted). He must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (citation modified) (citation omitted). "The plaintiff must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason. . . . The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006) (citation modified) (citation omitted).

## IV.    DISCUSSION

### A.    We grant summary judgment for Oxford on Mr. Amodu's Title VII claims because Mr. Amodu cannot rebut Oxford's LNDR for its employment actions

Summary judgment is warranted in Oxford's favor because Mr. Amodu cannot rebut Oxford LNDR for investigating, suspending, and terminating him: the sexual harassment allegations against him. We assume, without deciding, that Mr. Amodu establishes a *prima facie* case of race, national origin, and sex-based discrimination. It is undisputed that he is (1) a member of a protected class, as a black man of Nigerian descent; who (2) was qualified for his position of Nursing Supervisor; and who (3) suffered an adverse employment action. DI 24-1 at 10; DI 25-1 at 6. That takes care of the first three prongs of his *prima facie* burden. *Makky*, 541

10

F.3d at 214.  As Mr. Amodu's burden in establishing a *prima facie* case is not high, we will assume that he alleges sufficient facts to raise an inference of race, national origin, and sex-based discrimination against him — particularly in light of his allegations that he notified Oxford staff that his white, female subordinates were complaining about him and making comments about African men, and the uncertainty of the timing and connection between such comments and the sexual harassment allegations against him.  *See Sempier*, 45 F.3d at 728; *Makky*, 541 F.3d at 214.

With the burden now shifted to Oxford to articulate an LNDR for its decision to investigate, suspend, and terminate Mr. Amodu, we conclude that Oxford has articulated such an LNDR.  Oxford asserts that it took these actions against Mr. Amodu because of the sexual assault allegations against him.  DI 24-1 at 14-16.  The record indicates that Oxford has a clear, zero-tolerance policy regarding sexual harassment, which prohibits the conduct allegedly committed by Mr. Amodu.  DI 23 at ¶¶ 15, 52-53, 59.  Oxford policy provides that sexual harassment is among the most severe categories of employee misconduct, and such conduct may result in an employee's termination.  *Id.* at ¶¶ 18-19.  The policies, which Mr. Amodu reviewed and acknowledged, outline that every harassment complaint will be investigated, and the record reflects (and Mr. Amodu agrees) that it is common for such investigations to occur and for individuals accused of misconduct — including sexual harassment — to be suspended pending investigation into that misconduct.  *Id.* at ¶¶ 16-17, 46.  It is also Oxford's policy, which Mr. Amodu recognizes, to maintain the confidentiality of accusers in a sexual harassment investigation.  *Id.* at ¶ 55.  There is no genuine dispute that Mr. Amodu was accused of sexual harassment by two complainants, investigated for such harassment and suspended during the course of that investigation, and terminated following the conclusion of that investigation.  *Id.* at

¶¶ 38-39, 41, 44-45, 57.  Oxford's explanation that Mr. Amodu was fired because of the sexual harassment allegations against him thus constitutes an LNDR for his investigation, suspension, and ultimate termination.  *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) (concluding that employer provided an LNDR for terminating the employee based on his violation of the employer's code of conduct and anti-harassment policy).

Mr. Amodu does not meet his burden of rebutting Oxford's proffered LNDR.  The record before us does not demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Oxford]'s proffered legitimate reason[] for its action that a reasonable factfinder could rationally find them unworthy of credence" such that a factfinder could "infer that [Oxford] did not act for [the asserted] non-discriminatory reason[.]" *Fuentes*, 32 F.3d at 765 (citation modified) (citation omitted).  Other than Mr. Amodu's allegations that he heard unspecified female employees making comments about African men being too strict, mean, and disrespectful to women, and his own belief that he was discriminated against based on his race, national origin, and sex, nothing in the record points to discrimination against Mr. Amodu.  And his subjective beliefs are not sufficient to rebut Oxford's LNDR.  *See Kirleis*, 560 F.3d at 161.  Nor does he point with any specificity to any similarly situated employees, who were employed at Oxford while he was there, and who either (1) claimed that they were discriminated against based on race, national origin, or sex; or (2) were accused of sexual harassment.  Indeed, he acknowledges that the record does not support the existence of any such individuals.  DI 23 at ¶¶ 50-51.  And Mr. Amodu acknowledges that (1) Oxford had a zero-tolerance sexual harassment policy; (2) for which employees would commonly be investigated upon receiving a complaint against them and suspended pending that investigation; (3) during

12

which the confidentiality of the accusers would be maintained; and (4) following which the employee could be terminated. *Id.* at ¶¶ 17, 19, 46, 52, 55. There is no evidence in the record that the individuals who investigated, suspended, and terminated Mr. Amodu displayed any discriminatory animus toward him. Nor is there any evidence indicating that the unidentified individuals who allegedly made comments about African men, or who had issues with his supervision, were involved in the decision to investigate, suspend, or terminate Mr. Amodu — let alone that any alleged animus they had was causally linked to those decisions. *See McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011). Indeed, Mr. Amodu knows the names of the two sexual harassment complainants, and he does not allege (nor is there any indication in the record to suggest) that these individuals had any race, national origin, or sex-based animus toward him. On this record, we cannot say that Mr. Amodu has shown that Oxford's proffered reason for investigating, suspending, and terminating him (the sexual harassment allegations) "was so plainly wrong that it cannot have been [its] real reason" and that "the real reason [was] [discrimination]." *Atkinson*, 460 F.3d at 454 (citation modified). Summary judgment is therefore warranted in Oxford's favor.

## V.   CONCLUSION

Mr. Amodu cannot rebut Oxford's legitimate, non-discriminatory reason for investigating, suspending, and ultimately terminating him: that he was accused of sexual harassment in the workplace. We therefore conclude that summary judgment in Oxford's favor is warranted on Mr. Amodu's Title VII claims of race, national origin, and sex-based discrimination. An appropriate order accompanies this memorandum.

13